<span style="color:red">Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000199
23-DEC-2016
08:31 AM</span>

NO. CAAP-16-0000199

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

In the Interest of K Children

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 13-00072)

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, and Fujise and Ginoza, JJ.)

The Department of Human Services (DHS) filed a "Motion to Establish a Permanent Plan" (Permanent Plan Motion) with respect to five children of Mother-Appellant (Mother) and Father-Cross-Appellant (Father). The goal of the proposed permanent plan was to establish a legal guardianship of the five children without termination of parental rights, with the anticipated legal guardians being the children's maternal grandparents. When trial on DHS's Permanent Plan Motion began in January 2016 before the Family Court of the First Circuit (Family Court),[1] the five children ranged in age from seventeen to ten. During the trial, DHS requested that the Permanent Plan Motion be continued as to the oldest child (Oldest Child) and proceed as to the other four children (Four Younger Children).

After three days of trial, the Family Court, on March 8, 2016, issued its "Orders Concerning Child Protective Act"

---

[1] The Honorable Steven M. Nakashima presided.

(Permanent Plan Order). The Permanent Plan Order granted DHS's Permanent Plan Motion as to the Four Younger Children, continued foster custody for the Four Younger Children, and set the matter for a contested guardianship hearing regarding the Four Younger Children. The Family Court continued the Permanent Plan Motion as to Oldest Child. Mother appeals and Father cross-appeals from the Permanent Plan Order. We affirm.

BACKGROUND

I.

The three oldest children were placed with their maternal grandparents by Mother and Father in about 2004 and lived with maternal grandparents since that time. When DHS's involvement in this case began in early 2013, the two youngest children were living with Mother and Father, who were homeless. On March 29, 2013, DHS received a report of threat and abuse and threat of neglect to the two youngest children by Father. The complainant provided information that on March 28, 2013, a child reported that Mother ran away from Father because he had beaten and raped her and that "beating and raping are ongoing toward [M]other." The child further reported that Father is a chronic drug user; that Father does not feed them but takes them to other people's homes so they can be fed; that Father has threatened to hit them; and that Father screams in their ears that they are liars. DHS received information that Father had attempted to withdraw the two youngest children from school and that the two youngest children had attempted to run away from Father but were unsuccessful.

DHS interviewed Mother who reported that Father is using drugs and they have a history of domestic violence with each other. The two youngest children reported a fear towards Father due to the history of domestic violence between their parents. Mother told DHS that she filed a temporary restraining order (TRO) against Father and would be protective of her children. However, a short time later, DHS learned that Mother had dissolved the TRO against Father.

2

On April 24, 2013, DHS filed a petition for temporary foster custody of all five children. Mother and Father stipulated to foster custody. The two youngest children were placed in the foster custody of their maternal grandparents along with the three oldest children, who were already living with maternal grandparents. On January 20, 2015, DHS filed its Permanent Plan Motion, which sought legal guardianship for all five children until they became adults, with no request for termination of parental rights. DHS apparently also later filed a petition for appointment of maternal grandparents as co-guardians of all five children. The hearing on the Permanent Plan Motion was continued several times, including continuances granted at the request of Mother and Father. In September 2015, Oldest Child apparently attempted to commit suicide by hanging herself while residing with maternal grandparents. On October 22, 2015, Father filed a motion for an immediate review hearing to review the appropriateness of the children's placement with maternal grandparents. At a hearing on the motion held on December 3, 2015, DHS offered to attempt to place Oldest Child with Father, which Oldest Child had requested, and Father withdrew his motion for an immediate review hearing as to the Four Younger Children. The Family Court denied the request for reunification of Father with Oldest Child because Father's recent drug tests were positive for cannabis use, and the Family Court wanted evidence that Father could remain drug free.

II.

On January 13, and 14, 2016, and February 11, 2016, the Family Court held a trial on DHS's Permanent Plan Motion. At the beginning of the trial, DHS moved to continue the Permanent Plan Motion as to Oldest Child, which the Family Court subsequently granted. The trial proceeded on the Permanent Plan Motion as to the Four Younger Children. On March 7, 2016, after the conclusion of trial, the Family Court orally granted DHS's Permanent Plan Motion as to the Four Younger Children. It

3

appears that maternal grandfather passed away shortly after the Family Court's oral ruling.

On March 8, 2016, the Family Court issued its Permanent Plan Order, which granted DHS's Permanent Plan Motion as to the Four Younger Children, ordered that the foster custody of the Four Younger Children be continued, and scheduled a contested hearing on the petition for guardianship with respect to the Four Younger Children.

III.

On June 28, 2016, the Family Court issued "Findings of Fact and Conclusions of Law" in support of its Permanent Plan Order.

A.

The Family Court made the following factual findings based on the evidence presented at trial.

1.

Mother and Father have a long history of domestic violence and a dysfunctional relationship that negatively affected their ability to provide a safe family home for their children. In April 2013, the Family Court placed the children in foster custody after DHS received information that in March 2013, Father was beating and raping Mother. In September 2013, Father was arrested for allegedly barricading Mother inside his room at a clean and sober house, and he spent four nights in jail. In October 2013, Mother filed a TRO petition against Father, alleging that Father choked Mother until she almost blacked out. Later in October 2013, Father and Mother were involved in a domestic violence altercation which resulted in Father going to jail for five days. In September 2015, while Mother and Father were homeless and living in a car, "Father threatened to bury Mother in the ground so that no one would find her, fastened her seatbelt, and entwined his legs with hers so she could not leave." Mother and Father have a pattern of filing TROs against each other, then dissolving or refusing to enforce the TROs and voluntarily having contact with each other.

4

Despite drug treatment, Father has not been able to maintain a clean and sober lifestyle. He has repeatedly tested positive for marijuana use, and he was unable to avoid such use even when Father was aware that DHS was considering the possibility of allowing placement of Oldest Child with him. In addition to incidents of domestic violence, Father made threatening statements to a DHS case manager, stating that what she was saying to Father was going to make him have to shoot all the social workers. Father also often declined offered visits with the children because he was not willing to go where his children were to accommodate their schedules.

Mother has failed to demonstrate that she can be protective of the children. Despite the ongoing domestic violence and safety issues presented by her relationship with Father, Mother has not been able to stay apart from Father and has continued to remain in contact with Father and at times has resided with him. Mother has not been consistent with her visits with the children, and she does not appear to want to be a parent on a full-time basis.

2.

Mother and Father have allowed the three oldest children to live with maternal grandparents for ten years. Mother and Father were homeless when the two youngest children were living with them, prior to the Family Court awarding DHS foster custody over all five children in April 2013 and DHS placing the children with their maternal grandparents. At the start of trial, the children had been in foster care for two years and nine months. The Four Younger Children have told the Family Court that while they love their parents and want to maintain contact with their parents, they do not feel safe living with either or both parents, and they want to remain with their maternal grandparents.

The Family Court found that Father and Mother have had more than enough time to show that they are able to provide a safe family home for their children, but have failed to make this

5

showing and have also failed to show that they would be able to provide a safe family home within a reasonable period of time. The Family Court also found that the children have waited long enough and need to know they have a long-term home where they can be safe and have a stable home. The Family Court noted that the goal of the proposed permanent plan was co-guardianship of the Four Younger Children with the maternal grandparents. The Family Court further found that although maternal grandfather (Grandfather) had recently passed away several weeks after its oral granting of the Permanent Plan Motion, a guardianship with maternal grandmother (Grandmother) alone would still be appropriate.

The Family Court found that adoption of the Four Younger Children was not in their best interest because, among other things, they clearly know who their parents are and want to have contact with their parents, even though they do not want to live with their parents and feel safe and secure in the home of Grandmother. The Four Younger Children's Guardian Ad Litem agreed that the proposed permanent plan with the ultimate goal of guardianship was in the best interest of the Four Younger Children.

B.

The Family Court concluded that Father and Mother are not presently willing and able, and it is not reasonably foreseeable that within a reasonable period of time Father and Mother will become willing and able, to provide the Four Younger Children with a safe family home, even with the assistance of a service plan. The Family Court further concluded that the proposed permanent plan with the ultimate goal of guardianship is in the best interest of the Four Younger Children.

STANDARDS OF REVIEW

We apply the following standards in reviewing decisions of the family court:

> Generally, the "family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion."
> . . . .

6

The family court's [findings of fact] are reviewed on appeal under the "clearly erroneous" standard. A [finding of fact] "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." "'Substantial evidence' is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."

On the other hand, the family court's [conclusions of law] are reviewed on appeal de novo, under the right/wrong standard. . . .

However, the family court's determinations . . . with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time present mixed questions of law and fact; thus, inasmuch as the family court's determinations in this regard are dependant upon the facts and circumstances of each case, they are reviewed on appeal under the "clearly erroneous" standard. Likewise, the family court's determination of what is or is not in a child's best interests is reviewed on appeal for clear error.

Moreover, the family court "is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal."

In re Jane Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) (citations, brackets, and ellipsis points omitted).

DISCUSSION

I.

On appeal, Father challenges the Family Court's determinations that: (1) he is not presently willing and able to provide the Four Younger Children with a safe family home, even with the assistance of a service plan; (2) it is not reasonably foreseeable that he will become willing and able to provide the Four Younger Children with a safe family home, even with the assistance of a service plan, within a reasonable period of time; and (3) the permanent plan is in the best interest of the Four Younger Children. We conclude that there was substantial

evidence to support the Family Court's challenged determinations, which were not clearly erroneous, and that the Family Court did not err in entering its Permanent Plan Order.

There was substantial evidence to support the Family Court's determinations that Father was not presently able to provide, and would not within a reasonable period of time become able to provide, the Four Younger Children with a safe family home. While Father questions Grandmother's ability to care for the Four Younger Children in light of Grandfather's death, the Family Court specifically acknowledged Grandfather's death and found that guardianship would be appropriate with Grandmother alone. Although Father presented some contrary evidence, there was substantial evidence to support the Family Court's determination that the permanent plan was in the best interests of the Four Younger Children, and this determination was not clearly erroneous. Father has not shown that the Family Court erred in entering the Permanent Plan Order.

II.

On appeal, Mother contends: (1) there was insufficient evidence to support the Family Court's determination that the permanent plan with the goal of legal guardianship was in the best interest of the Four Younger Children; (2) the permanent plan did not comply with the requirements of Hawaii Revised Statutes (HRS) § 587A-32(b)(2) (Supp. 2015) that a permanent plan be updated to describe proposed revisions and reasons for the revisions; and (3) the Family Court erred in qualifying case manager Kelly Hemphill (Hemphill) as an expert in the field of child protective and child welfare services. We disagree.

A.

Mother contends that the Family Court erred in making determinations regarding parental fitness because the Permanent Plan Motion did not seek termination of parental rights. However, whether Mother was a fit parent was relevant to whether the permanent plan with a goal of legal guardianship was in the

best interest of the Four Younger Children.  We therefore conclude that the Family Court did not err in making determinations regarding Mother's parental fitness in deciding the Permanent Plan Motion.

Mother also argues that Oldest Child's attempted suicide raised questions about whether the permanent plan and the current placement of the Four Younger Children with Grandmother was in the Four Younger Children's best interest.  The Family Court heard evidence about Oldest Child's situation, including evidence about her attempted suicide, in considering the Permanent Plan Motion.  Based on the evidence presented, we cannot say that the Family Court clearly erred in determining that the permanent plan was in the best interest of the Four Younger Children.

B.

Mother contends that DHS violated HRS § 587A-32(b)(2) by not updating the permanent plan, which was prepared in December 2014, for each periodic review or permanency hearing to describe proposed revisions to the goal of the plan and reasons for the revisions.  Hemphill acknowledged that the permanent plan was not updated as it should have been, but testified that the goal of the permanent plan for the Four Younger Children had not changed since it was drafted.  After considering things that occurred after the permanent plan was filed, Hemphill testified that she recommended that the Family Court proceed with the permanent plan as to the Four Younger Children.  The Family Court considered the validity of the permanent plan in light of events that had occurred after the plan was filed and concluded that the permanent plan was in the best interest of the Four Younger Children.  We conclude that the failure of DHS to update the permanent plan with revisions does not provide a basis to overturn the Family Court's decision.

C.

Mother argues that the Family Court erred in qualifying Hemphill, the permanency case manager in this case, as an expert in the field of child protective and child welfare services. We disagree.

Hemphill was hired by DHS in July 2014, and the instant case was the first case for DHS that she worked on as a permanency case manager. However, Hemphill earned an undergraduate degree in Psychology in 2004 and an associate's degree in Human Services. Before being hired by DHS, Hemphill worked as an investigator with Child Welfare Services in Texas and also was a family strengthening services worker, which involved case management for families involved with Child Protective Services. She was hired by DHS as a Human Services Professional III and works as a permanency case manager, doing the same work as persons hired by DHS with a degree in Social Work. As a permanency case manager with DHS, she provides case management to families with children in foster care, including referrals for needed services, assessments for continuing safety concerns, monthly visits to the parents and children in her cases, and reports to the court.

We conclude that Hemphill had sufficient education and experience to qualify as an expert and to provide expert testimony on the matters about which she was questioned. We therefore conclude that the Family Court did not abuse its discretion in qualifying Hemphill as an expert. See Barbee v. Queen's Medical Center, 119 Hawai'i 136, 152, 194 P.3d 1098, 1114 (App. 2008) ("Whether a witness qualifies as an expert is a matter addressed to the sound discretion of the trial court, and such determination will not be overturned unless there is a clear abuse of discretion." (internal quotation marks, citation, and brackets omitted)).

10

CONCLUSION

Based on the foregoing, we affirm the Family Court's Permanent Plan Order.

DATED: Honolulu, Hawai'i, December 23, 2016.

On the briefs:

Thomas A. K. Haia
for Father-Appellee/
    Cross-Appellant

Tae Chin Kim
for Appellant-Mother

Gay M. Tanaka
Julio Herrera
Deputy Attorneys General
Department of the Attorney General
for Appellee DHS

*Craig H. Nakamura*

Chief Judge

Associate Judge

Associate Judge

11